Nathan METZ

v.

TUSICO, INC.

Civ. No. 1395.

United States District Court
E. D. Virginia,
Alexandria Division.

Jan. 27, 1958.

Nathan L. Silberberg and David I. Abse, Washington, D. C., for plaintiff.

Armistead L. Boothe, Alexandria, Va., for defendant.

ALBERT V. BRYAN, District Judge.

Sued upon here is a covenant, which was included in a contract for the sale of land in Fairfax County, Virginia from the appellee to the appellant, in these words: "The seller herein warrants that water is available to the property along state route 626, or rear of the subject property." The case now comes on upon the remittitur of the Court of Appeals vacating this court's dismissal of the action and remanding it for further findings. Metz v. Tusico, Inc., 4 Cir., 1957, 246 F.2d 54. With additional evidence adduced by the parties at the second trial, specific findings are now made in the respects noted in the opinion of the appeals court as well as upon other matters deemed to be relevant.

Antecedent to the contract in suit, appellee Tusico had procured an agreement, dated April 6, 1955, for the purchase of a tract of 32 acres from one Wilkinson at a unit price aggregating $89,000, with settlement required within "90 days after approval of subdivision and zoning". On August 19, 1955, with the first agreement still open, Tusico entered into the contract in suit. It provided for the sale of this tract to the appellant Metz, describing himself "as agent for corporation or corporations to be formed", for $100,000, settlement to be made within 120 days of the rezoning. Perhaps relevant to the quoted covenant is the further stipulation in this contract that its independent provisions should survive the deed of conveyance.

The Wilkinson-Tusico agreement was conditioned upon success in obtaining rezoning of the acreage under the County regulations. Application for the new zoning had been filed by Tusico before it made the Metz contract on August 19, 1955. Thereafter the petition was pressed jointly by the appellant and appellee, their contract also being contingent upon the procurement of the desired zoning. It was obtained November 9, 1955.

At the instance of Metz, an agreement was reached on March 8, 1956 by him, Wilkinson and Tusico extending the date for settlement of the Wilkinson-Tusico and the Tusico-Metz contracts until August 6, 1956. Next, by letter of July 24, 1956 Tusico advised Metz that it would expect settlement of their contract on August 6, 1956, a copy of the letter going to Wilkinson. Nothing further was heard by Tusico from Metz until September 5, 1956, when it received a letter, dated September 4, 1956, from the attorney for Metz stating that settlement

of the contract would be had on September 5th.

In the meantime Metz, as agent, had agreed in a writing dated August 10, 1956 to sell the tract to Louis Frazier for $127,500. The vendee was granted fourteen days to ascertain the cost and feasibility of supplying water and other utilities to the property, reserving the right to withdraw from the contract should the cost be "abnormal". This agreement further provided that if the vendor could supply adequate water to the boundary of the tract, then the purchase price should be increased to $133,875, an addition of $6,375.

Likewise in the interim, on August 24, 1956, Metz, as agent, entered into another contract with Frazier agreeing to sell him the tract for $115,000. It referred to the water covenant of Tusico-Metz contract and reserved to Metz the exclusive right to enforce the covenant, with Frazier pledging his assistance. This second Metz-Frazier contract, Metz says, was the result of the unavailability of water—that he had to reduce the sale price because of this default in the water covenant. However, the agreement provided that if water should be brought to the property, without cost to Frazier, he would pay to Metz, in addition to the basic purchase price, the sum of $125 for each lot in the subdivision, a total of $10,000, for all of the contracts stipulated that at least 80 lots should be cut from the tract.

All of the parties or their representatives met on September 5, 1956 for the settlement. Tusico did not know the contents of the interim Metz-Frazier contracts except that they purported to assign the purchase to Frazier. The tract was then conveyed directly from Wilkinson to Bernard M. Fagelson, the attorney for Frazier, in trust for him and his associates. In the settlement Wilkinson and Tusico received substantially the amounts due them under their respective agreements.

The tract is rectangular and at the north fronts on State Route 626. As it runs eastwardly Route 626 intersects, at 3,350 feet, with Fort Hunt Road, a north and south highway. In the latter roadway was located a transmission line of the Alexandria Water Company (the same for all purposes here as the Virginia Water Company mentioned in the record), sufficient to supply water to the 32-acre tract and the vicinity. The tract was situated within the service-territory allotted to the Alexandria Water Company by the State Corporation Commission of Virginia, the body having the regulation of public utilities. When the water covenant was made, there was no main of the Alexandria Water Company in Route 626, save at the intersection just mentioned.

However, immediately contiguous to the subject property on the south was a residential subdivision. Water was supplied there by a private corporation, the Sydnor Pump and Well Company. Again, on the north of, and abutting, Route 626 was another residential subdivision with water supplied by Sydnor, a distance of approximately 1,500 feet westwardly from the 32 acres. Also on the north of, and abutting, Route 626 and likewise supplied by Sydnor, was still another subdivision, about 1,500 feet east of the 32-acre tract. Thus the Wilkinson tract was virtually in a group of water supplies when the covenant was made. In December, 1956, some three months after the settlement of the Wilkinson-Tusico-Metz-Frazier contracts of sale, the Alexandria Water Company commenced preparations for the installation of a water main along Route 626 from its intersection with Fort Hunt Road. It was completed in June, 1957, bringing water to the present tract at no cost to the owners of the land.

Metz now sues Tusico on the allegation that water was not available as required by the covenant, either along Route 626 or in the rear of the tract. The damages claimed by him are, first, the difference in the sale prices to Frazier in the first and second contracts with him; and then Metz seeks to recoup the outlays made by him towards the development of the land.

On reconsideration the court holds that the main on Fort Hunt Road, 3,350 feet distant, was not "available" to the tract. However, it finds that both Metz and Tusico had, before settlement of the contracts and before this action was begun, considered as "available" the water supplies of the subdivisions to the south, to the northeast and to the northwest of the tract. By "available" the parties to the contract did not contemplate that water should be at the tract's edge. Whenever the plaintiff intended that utilities should be brought to his property, he explicitly so stated in his agreements, as witness the specifications for sewer in section (11) of the Tusico-Metz contract and for water on pages 3 and 4, respectively, of the two Metz-Frazier contracts. Instantly Metz only intended that water should be obtainable at a reasonable cost. The conduct of the parties and the other circumstances clearly establish that the water in the nearby subdivisions was "available" within the intent of the covenant.

Primarily, the water in the subdivisions on the north side was actually "along state route 626" as recited in the covenant, for it was actually at, or accessible from, the roadway and not an unreasonable distance from the property. In the "rear of the subject property" water was to be found much closer. Physically, then, the water was "available" within the meaning of the covenant. Legally, it is inconceivable that the State Corporation Commission would have denied the tract all water by forbidding it to tap the Sydnor sources—certainly not for the brief period before the Alexandria's mains reached the land. Sydnor was not under the Commission's control.

Metz' engineers and surveyors, while studying the land with an eye to rezoning, subdividing and developing it, must have been aware of the location of the several sources of water in the vicinity. That was in the fall of 1955. Certainly Metz is chargeable with their knowledge. With the physical and legal position of the water sources in mind, Metz on March 8, 1956, obtained one extension of his agreement until August, and took another from August into September, 1956. He did not raise any question of the water covenant then or at the settlement. Surely, if the parties had not understood that the covenant was fulfilled, Tusico would not have permitted these repeated delays and would not have closed the contract. It could have avoided all possible liability on the covenant by terminating the contract for non-performance by Metz within the specified period.

It must be remembered that neither the postponement of the settlement nor the sale of his contract by Metz was attributed by him to the absence of water at the site. He gives the reasons: " * * * first it was a matter of getting the rezoning which took many months, and then, then we found out, well we were having trouble through the county getting all our plans and specifications through. In the meantime we were incurring a lot of expenses in connection with this piece of land. When finally our funds ran short, we decided after many months that we'd better sell the property". True, in computing his damages the plaintiff testifies that the contract extension in March, 1956 was due to the failure in the water covenant. However, here he must be in error for he said he had not discovered the absence of water until he began to negotiate with Frazier for the August, 1956 sales.

But conclusive proof of the covenant's satisfaction is found in the rezoning. Under the ordinances of Fairfax County, rezoning was not permitted without provision for a water supply. With Tusico Metz vigorously prosecuted the application for rezoning. Thus he vouched the water's availability. As already noted, the rezoning of the tract (except as to a little swampy portion) was granted by the County in November, 1955, within three months of Metz' contract. Obviously, Metz had convinced the County of the accessibility of water. In fact, it was no nearer the subject property then than it was at any date to which the complaint is directed.

Rezoning was an important premise of every contract in this case. Upon it the Tusico-Metz contract was dependent for subsistence. Without it Metz' resale was vitiable. Rezoning gave the land its development potentiality and, hence, its enhanced value; it raised the worth from $500 to $3,000 per acre. The availability of water to the tract when the contract was signed cannot be denied without repudiation of the rezoning. Acceptance of the rezoning is an irrevocable acknowledgment by Metz that he considered the water covenant to have been made good.

■■ However, even if the covenant was never performed, the Virginia doctrine of damages would bar the plaintiff of recovery of anything beyond his deposit under the contract, interest thereon and his title costs. The covenant here is of no greater dignity than the central covenant of the contract, that is, to sell and convey. For a failure to perform a covenant of the latter character a vendor is not liable to the vendee for loss of his bargain or expenditures for development of the land, so long as the vendor has acted in good faith. This is even true of a breach of warranty in a deed and results in eviction. Spruill v. Shirley, 1944, 182 Va. 342, 28 S.E.2d 705, 708 and cases cited; Williams v. Snider, 1949, 190 Va. 226, 56 S.E.2d 63, 64; Click v. Green, 1883, 77 Va. 827, 834.

■ This rule is especially equitable when, as here, the vendee has never bound himself personally to the obligation, always interposing his agency capacity. But even the enumerated items are no longer recoverable, for the vendee elected to proceed with the contract knowing that his vendor could not perform the covenant. The vendor was not bound to bring water at all costs, and the court finds Fort Hunt Road unreasonably distant.

■ Finally, in truth the breach of the covenant, if any, affected the plaintiff only slightly. To begin with, in this type of case a plaintiff's damages at most cannot exceed the difference in the values of the land as warranted and as existent. The plaintiff resold the land, within thirteen months of the execution of his contract with Tusico, for 25% more than he paid for it ($115,000 plus $10,000 for water when supplied, a total of $125,000 against $100,000 cost). His complaint is that the unavailability of water prevented him from selling at $133,875 ($127,500 plus $6,375 for water when added) instead of $125,000, a loss of $8,875. But, as we have seen, water came to the property without expense to Metz, in June, 1957—within nine months after settlement of the contract. The breach of the covenant did not force the sale of the land. In any event, undoubtedly Metz could have gotten as much for it in June, 1957 as he did in the previous August. Hence, his only possible injury was postponement of the sale, in effect the loss of the use of $8,875, from September, 1956 to June, 1957, a loss compensatable by interest of not more than $405. This answers the finding requested by the Court of Appeals as to the effect of the deferment of the installation of the main in Route 626 until June, 1957. But, for the reasons already outlined, the court does not believe the plaintiff is entitled to any amount as damages.

The complaint will be dismissed at the plaintiff's cost.